# 12-2344-cv

## United States Court of Appeals

### *for the*

## Second Circuit

AVRAHAM GOLD, Individually, on behalf of all others similarly situated,

*Plaintiff-Appellant*,

v.

NEW YORK LIFE INSURANCE COMPANY; NEW YORK LIFE
INSURANCE AND ANNUITY CORPORATION; NEW YORK LIFE
INSURANCE COMPANY OF ARIZONA; JOHN DOES 1 through 50,
said names being fictitious individuals; ABC CORPORATIONS 1 through
50, said names being fictitious companies, partnerships, joint ventures
and/or corporations; and NEW YORK LIFE SECURITIES, LLC f/k/a
New York Life Securities, Inc.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

Richard G. Rosenblatt
Sean P. Lynch
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
T. 609.919.6609
F. 609.919.6701

Michael L. Banks
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
T. 215.963.5387
F. 215.963.5001

*Attorneys for Defendants-Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees New York Life Insurance Company, New York Life Insurance and Annuity Corporation, NYLIFE Insurance Company of Arizona and NYLIFE Securities LLC certify that New York Life Insurance and Annuity Corporation, NYLIFE Insurance Company of Arizona and NYLIFE Securities LLC (collectively, "New York Life") are wholly-owned subsidiaries of New York Life Insurance Company. New York Life Insurance Company is a mutual insurance company with no stock or shareholders. Accordingly, no parent corporation or publicly held corporation owns ten percent (10%) or more of New York Life Insurance Company's stock.

**TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................1

COUNTERSTATEMENT OF ISSUES ...............................................1

STATEMENT OF THE CASE ..............................................................2

SUMMARY OF THE ARGUMENTS ..................................................6

I.   The District Court Correctly Held That Gold Was An Exempt Outside Salesperson. ..............................................................6

II.  The Manner In Which New York Life Compensated Gold Did Not Violate New York Labor Law § 193. ..........................................7

III. The District Court Properly Refused To Apply The Wage Theft Protection Act Retroactively. ......................................................8

IV.  The District Court Properly Dismissed The Action Under CAFA's Home State Exception..................................................................8

STATEMENT OF FACTS ...................................................................9

I.   The Terms of Gold's Affiliation With New York Life Are Contained In What The District Court Described As A "Patchwork of Agreements." ..............................................................9

II.  Gold Was A Salesperson...........................................................10

    A.   Gold Was A Licensed And Registered Insurance Salesperson Who Obtained A Securities Registration; He Was Not A Stockbroker Or Financial Advisor...................................10

    B.   Gold's Duties Revolved Around "The Sales Cycle." .......................11

    C.   New York Life Recruited, Hired And Trained Gold To Sell. ...........13

    D.   Making Sales Was How Gold Retained His Job And Got Paid. .......14

    E.   Gold Worked Outside New York Life's Offices And Was Not Subject To Direct Or Constant Supervision. ...................................15

    F.   Gold's Inadmissible Expert Report. .................................15

III. Gold's Ledger-Based Compensation.........................................16

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................19

I. The District Court Properly Dismissed Gold's Overtime And Minimum Wage Claims Because Gold Was An Exempt Outside Salesperson. ...............................................................................19

    A.    The Purpose And Elements Of The Outside Sales Exemption. ........19

    B.    Gold's Primary Duty Was Selling.................................................21

    C.    Gold's Sales Techniques Did Not Alter His Primary Duty..............26

    D.    Gold's Registered Representative Status Did Not Alter His Exempt Status.................................................................................27

    E.    The District Court Correctly Observed That The DOL's Insurance Agent Opinion Letter Supports The Conclusion That Gold Was An Outside Salesperson...................................................30

II. Gold's Compensation Did Not Violate NYLL § 193. ...............................33

    A.    <u>Pachter</u> Permits Ledger-Based Commission Systems.......................33

    B.    The Written Agreements Do Not Establish A Section 193 Violation.............................................................................................36

    C.    Gold's Compensation and <u>Pachter's</u> Compensation Are Materially Indistinguishable............................................................38

    D.    Gold's Tax Treatment And Debt Recompense Arguments Do Not Support Partial Judgment In His Favor.....................................41

    E.    Even If There Were Ambiguity In The Parties' Written Agreements, <u>Pachter</u> Dictates That Gold's Admissions And Acquiescence Bar His Claim.............................................................43

    F.    Gold's Company Store Argument Fails. .........................................45

III. The Text, History And Purposes Of The Liquidated Damages Amendment Confirm Its Nonretroactivity...................................................47

IV. Dismissal Was Proper Under The Home State Exception. .........................50

    A.    The Home State Exception Is Not Discretionary Or Waivable.........51

    B.    The Timing Of New York Life's Home State Exception Motion Was Immaterial But Nonetheless Appropriate. ................................51

ii

## TABLE OF CONTENTS

**Page**

V.    Dismissal Was Neither Unfair Nor Prejudicial............................................55

CONCLUSION ...................................................................................................56

# TABLE OF AUTHORITIES

**Page**

CASES

Angello v. Labor Ready, Inc.,
   7 N.Y.3d 579 (2006) ..................................................................45, 46

Anthony v. Small Tube Mfg. Corp.,
   535 F. Supp. 2d 506 (E.D. Pa. 2007)..................................................53

Benavidez v. Plaza Mexico, Inc.,
   No. 09-5076, 2012 WL 500428 (S.D.N.Y. Feb. 15, 2012) ................47

Bogle-Assegai v. Connecticut,
   470 F.3d 498 (2d Cir. 2006)................................................................55

Bouder v. Prudential Fin. Inc.,
   No. 06-4359, 2010 WL 3515567 (D.N.J. Aug. 31, 2010).................27

Browning Ave. Realty Corp. v. Rubin,
   615 N.Y.S.2d 360 (1st Dep't 1994) ....................................................55

Burkhart v. Washington Metro. Area Transit Auth.,
   112 F.3d 1207 (D.C. Cir. 1997) .........................................................28

Casas v. Conseco Fin. Corp.,
   No. 00-1512, 2002 WL 507059 (D.Minn. Mar. 31, 2002)................32

CFCU Comm. Credit Union v. Hayward,
   522 F.3d 253 (2d Cir. 2009).............................................................48

Chenensky v. New York Life Ins. Co.,
   No. 07-11504, 2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009).......7, 25

Christopher v. SmithKline Beecham Corp.,
   635 F.3d 383 (9th Cir. 2011), aff'd, 132 S.Ct. 2156 (2012)........23, 30

Conard v. Rothman Furniture Stores,
   No. 09-2059, 2010 WL 2835565 (E.D. Mo. July 16, 2010) .............53

Davis v. J.P. Morgan Chase & Co.,
   587 F.3d 529 (2d Cir. 2009)................................................................33

iv

# TABLE OF AUTHORITIES

**Page**

Dean Witter Reynolds, Inc. v. Ross,
    429 N.Y.S.2d 653 (1st Dep't 1980)...................................................................34

Fields v. AOL Time Warner,
    261 F. Supp. 2d 971 (W.D. Tenn. 2003) .............................................23, 26, 28

Freeman v. Nat'l Broad. Co.,
    80 F.3d 78 (2d Cir. 1996).................................................................................22

Gentile v. MCA Records, Inc.,
    793 N.Y.S.2d 407 (1st Dep't 2005) ..................................................................55

Graphic Communications Union v. CVS Caremark Corp.,
    636 F.3d 971 (8th Cir. 2011)................................................................50, 52, 53

Gregory v. First Title of America, Inc.,
    555 F.3d 1300 (11th Cir. 2009)...........................................................24, 25, 30

Hart v. FedEx Ground Package Sys., Inc.,
    457 F.3d 675 (7th Cir. 2006).............................................................................52

Hein v. PNC Fin. Services Grp., Inc.,
    511 F. Supp. 2d 563 (E.D. Pa. 2007)................................................................33

Henry v. Quicken Loans Inc.,
    No. 04-40346, 2009 WL 3199788 (E.D. Mich. Sept. 30, 2009) .......................28

Hodgson v. Krispy Kreme Doughnut Co.,
    346 F.Supp. 1102 (M.D.N.C. 1972)..................................................................24

Hollinger v. Home State Mut. Ins. Co.,
    654 F.3d 564 (5th Cir. 2011)......................................................................50, 51

Icicle Seafoods v. Worthington,
    475 U.S. 709 (1986).........................................................................................22

In re RBC Dain Rauscher Overtime Litig.,
    703 F. Supp. 2d 910 (D. Minn. 2010) ..............................................................33

Jewel Tea Co. v. Williams,
    118 F.2d 202 (10th Cir. 1941)....................................................................20, 26

v

# TABLE OF AUTHORITIES

**Page**

Ji v. Belle World Beauty, Inc.,
  No. 603882/2008 (N.Y. Sup. Ct. Aug. 24, 2011) .............................................48

Kamm v. Itex Corp.,
  568 F.3d 752 (9th Cir. 2009).............................................................................52

Landgraf v. USI Film Prods.,
  511 U.S. 244 (1994) . No ..................................................................................48

Lane v. Humana Marketpoint, Inc.,
  No. 09-380, 2011 WL 2181736 (D.Idaho Jan. 3, 2011)....................................23

Maldonado v. La Nueva Rampa, Inc.,
  No. 10-8195, 2012 WL 1669341 (S.D.N.Y. May 14, 2012)............................48

Marin v. JMP Restoration Corp.,
  No. 09-1384, 2012 WL 4369748 (E.D.N.Y. Aug. 24, 2012)...........................48

McLean v. Garage Mgmt. Corp.,
  No. 10-3950, 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012)............................48

Morrison v. YTB Int'l, Inc.,
  649 F.3d 533 (7th Cir. 2011).............................................................................50

Nielsen v. DeVry, Inc.,
  302 F. Supp. 2d 747 (W.D. Mich. 2003) ...........................................................24

Olivo v. GMAC,
  374 F. Supp. 2d 545 (E.D.Mich. 2004) .............................................................26

Pachter v. Bernard Hodes Group, Inc.,
  10 N.Y.3d 609 (N.Y. 2008)........................................................................passim

Pachter v. Bernard Hodes Group, Inc.,
  541 F.3d 461 (2d Cir. 2008)........................................................................40, 44

Pontius v. Delta Fin. Corp.,
  No. 04-1737, 2007 WL 1496692 (W.D.Pa. Mar. 20, 2007).............................23

Preston v. Tenet Healthsystem Mem'l Med. Center, Inc.,
  485 F.3d 793 (5th Cir. 2007).............................................................................54

# TABLE OF AUTHORITIES

**Page**

Prisco v. A & D Carting Corp.,
  168 F.3d 593 (2d Cir. 1999)..............................................................................41

Quintanilla v. Suffolk Paving Corp.,
  No. 09-531, 2012 WL 4086805 (E.D.N.Y. Sept. 17, 2012)..............................48

Ramos v. Baldor Specialty Foods, Inc.,
  687 F.3d 554 (2d Cir. 2012)..............................................................................22

Reiseck v. Universal Communications of Miami, Inc.,
  591 F.3d 101 (2d Cir. 2010)..................................................................22, 23, 26

Ryan v. Legends Hospitality, LLC,
  No. 11-3110, 2012 WL 3834088 (S.D.N.Y. Aug. 1, 2012) ..............................48

Schmidt v. Eagle Waste and Recycling, Inc.,
  599 F.3d 626 (7th Cir. 2010)..............................................................................26

SEC v. Lorin,
  869 F. Supp. 1117 (S.D.N.Y. 1994) ..................................................................49

Serrano v. 180 Connect, Inc.,
  478 F.3d 1018 (9th Cir. 2007)............................................................................50

Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.,
  130 S. Ct. 1431 (2010)..........................................................................................4

Stevens v. SimplexGrinnell, LLP,
  190 F. App'x 768 (11th Cir. 2006)...............................................................24, 25

Taylor v. Waddell & Reed, Inc.,
  No. 09-2909, 2012 WL 10669 (S.D.Cal. Jan. 3, 2012)........................25, 27, 29

Wicaksono v. XYZ 48 Corp.,
  No. 10-3565, 2011 WL 2022644 (S.D.N.Y. May 2, 2011)...............................47

Zubair v. EnTech Eng'g,
  No. 09-7927, 2012 WL 4887738 (S.D.N.Y. Oct. 1, 2012) ...............................48

**STATUTES**

26 U.S.C. § 3401(a) and 3402(a)............................................................................43

# TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1332...........................................................................passim

28 U.S.C. § 1367.................................................................................3

28 U.S.C. § 1447(c) ......................................................................54, 55

29 U.S.C. § 201 et seq.......................................................................20

29 U.S.C. § 202(a) .............................................................................20

29 U.S.C. § 213 .............................................................................20, 21

N.Y. Sess. Laws ch. 372 ...........................................................49, 50, 51

N.Y. Sess. Laws ch. 564 ....................................................................49

New York Insurance Law § 4228................................. 17, 18, 19, 42, 44

New York Labor Law § 193 ...........................................................passim

New York Labor Law § 198(1-a)..................................................2, 8, 49

New York Labor Law § 652 ..................................................................2

## REGULATIONS

26 C.F.R. § 1.401(k)-1(a)(4)(iii) .........................................................43

26 C.F.R. § 1.6041-2............................................................................43

29 C.F.R. § 541.2.................................................................................29

29 C.F.R. § 541.500.......................................................................21, 25

29 C.F.R. § 541.700.............................................................................21

69 Fed. Reg. 22145-46.........................................................................33

12 NYCRR § 142-2.2 ............................................................................2

# TABLE OF AUTHORITIES

**Page**

**RULES**

Fed. R. App. P. 32.......................................................................................1

Fed. R. Civ. P. 12(b)(1)............................................................................53

Fed. R. Civ. P. 56.1...................................................................................6

Fed. R. Evid. 702 .....................................................................................28

**OTHER AUTHORITIES**

DOL Opinion Letter FLSA2009-28 (Jan. 16, 2009)............................ 25, 27, 31, 32

N.Y. Spons. Mem. 2010 S.B. 8380 .......................................................49

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), but properly declined further exercise of jurisdiction under CAFA's home state exception, 28 U.S.C. § 1332(d)(4)(B), when discovery regarding class certification established that greater than two-thirds of the putative class and all defendants were New York citizens. Appellate jurisdiction exists under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES

1.    Did the district court correctly dismiss Avraham Gold's overtime and minimum wage claims based on the "outside sales exemption," where Gold regularly worked outside the office and undisputedly (1) sold insurance products; (2) was paid exclusively on a commission basis; and (3) was paid only for making sales – and not a penny for providing advice incidental to his sales?

2.    Did the district court correctly deny partial summary judgment on Gold's claim under New York Labor Law Section 193 ("Section 193") under the standard set forth in Pachter v. Bernard Hodes Group, Inc., 10 N.Y.3d 609 (N.Y. 2008), where the undisputed facts show that Gold agreed that his compensation would include negative adjustments for expenses against commission credits? Correlatively, whether this Court may affirm on the alternative ground that the record requires entry of judgment in favor of New York Life?

3.    Did the district court properly decline to imply retroactivity into Section 7 of the New York Wage Theft Prevention Act, New York Labor Law § 198(1-a) (McKinney 2011), where the statute does not provide for retroactivity?[1]

4.    Did the district court properly decline the further exercise of jurisdiction pursuant to CAFA's home state exception (28 U.S.C. § 1332(d)(4)(B)), which provides that "[a] district court **shall decline to exercise jurisdiction**" where more than two-thirds of the putative class and all of the defendants are citizens of the state where the action was filed?

## STATEMENT OF THE CASE

Gold purports to represent a putative class of insurance agents affiliated with New York Life in New York since April 2, 2003.  A4(Dkt. 12 ¶ 1).  He alleges violations of overtime and minimum wage requirements under 12 NYCRR §142-2.2 and N.Y. Labor Law § 652 and of New York's wage deduction statute, Section 193.  His putative class overlaps with, and is included within, a related putative class in the still-pending case Chenensky v. New York Life, et al., No. 07-3210 (S.D.N.Y.).  No class has been certified in either case.

New York Life initially raised the potential applicability of CAFA's home state exception in January 2010.  A1804(¶2).  At that time, New York Life noted

---

[1]  This issue is moot unless this Court reverses the district court's dismissal under CAFA's home state exception and remands for further federal proceedings on Gold's Section 193 claim because liquidated damages are unavailable in state court under CPLR §901(b).  Gold Br., p. 23.

that the primary defendants and, quite likely, more than two-thirds of the putative class were New York citizens.  Id.  Gold responded that the home state exception could "only be invoked on the basis of evidence presented by Defendants rather than supposition concerning class composition."  A1804(¶4).  By that point, the district court had bifurcated discovery and deferred class discovery (which would require generation of a class list) until after summary judgment as to Gold's individual claims.  A1804(¶4).

Between December 2009 and February 2011, the parties engaged in a first phase of discovery focused on Gold's individual claims and briefed summary judgment on those claims.  On May 19, 2011, the district court granted in part and denied in part New York Life's summary judgment motion.  SPA1-14.  The court dismissed Gold's overtime claims on the ground that he was an outside salesperson exempt from overtime.[2]  SPA11.  The court, however, denied summary judgment on Gold's wage deduction claim.  SPA12-13.

On June 17, 2011, the parties commenced class discovery concerning Gold's surviving wage deduction claim.  In August 2011, New York Life advised Gold that the preliminary class list being prepared in response to Gold's discovery requests suggested that the vast majority of the putative class lived in New York.

---

[2]  The district court's original order did not address Gold's minimum wage claim. The parties later stipulated to dismissal of that claim based on his adjudicated outside salesperson status, subject to his right to appeal that adjudication.  A1528.

3

A1805(¶6).  In response, Gold argued that he could avoid application of the home state exception because Defendant New York Life of Arizona ("NYLAZ") was a "primary defendant" and a citizen of Arizona.  New York Life advised Gold that NYLAZ was neither a primary defendant nor a citizen of Arizona.  A1805(¶7).

On August 19, 2011, Gold and Chenensky jointly moved for leave to add a liquidated damages claim.  A7(Dkt. 41).  In the weeks preceding that motion, Gold suggested the he would counter New York Life's argument that Shady Grove Orthopedics Associates, P.A. v. Allstate Ins. Co., 130 S. Ct. 1431 (2010), did not apply to a case predicated on discretionary supplemental jurisdiction under 28 U.S.C. § 1367 (like Chenensky), by arguing that his case was more solidly before the court under CAFA.  A1804(¶6).  New York Life responded that it could not acquiesce in such a representation to the court given that the preliminary class list strongly suggested that the home state exception applied.  A1804(¶6).

On September 16, 2011, New York Life finalized and produced the class list confirming that more than 80% of the putative class members lived in New York.  A1607(¶8).  It simultaneously submitted a pre-motion letter to Judge Pauley identifying the home state exception to CAFA as a jurisdictional problem.  At Gold's request, the district court permitted him to take jurisdictional discovery related to (1) the accuracy of the class list and (2) NYLAZ's "nerve center" citizenship.  That discovery spanned four months and indisputably confirmed that

4

greater than two-thirds of the class and NYLAZ were New York citizens.  A9(Dkt. 61-62); A1607-09.  Thereafter, New York Life moved to dismiss under the home state exception.

Separately, also on September 16, 2011, Gold and Chenensky jointly moved for partial summary judgment as to their expense-based (non-commission reversal) wage deduction claims.  On January 17, 2012, the district court denied that motion. The court held that the parties' written agreements were ambiguous and that Gold and Chenensky had "misread" Pachter v. Bernard Hodes Group, Inc., 10 N.Y.3d 609 (N.Y. 2008) – the controlling case governing commission-based compensation arrangements challenged under Section 193.  In so holding, the court correctly observed that the only material question to be resolved is whether the parties agreed that compensation would include negative adjustments for authorized expenses.[3] In that same opinion, the district court granted Gold and Chenensky's joint request to add liquidated damages claims, but denied their request to apply retroactively the statutory amendment to NYLL § 198 that quadrupled the liquidated damages penalties.  SPA16-20.

Finally, on May 14, 2012, the district court held that the home state exception

---

[3]  This is the "ledger-based compensation" system discussed throughout Gold's Brief.  The "ledger" reference derives from Gold's TAS Agreement, which discusses the creation of a "ledger" on which New York Life would post credits and negative adjustment debits, the reconciliation of which would net Gold his periodic compensation.  A1432-33(¶46).

5

applied.  As a result, the court dismissed Gold's claim.  This appeal followed.

## SUMMARY OF THE ARGUMENTS

**I.     The District Court Correctly Held That Gold Was An Exempt Outside Salesperson.**

Gold did not identify a single fact in dispute – material or otherwise – with respect to his overtime and minimum wage claims.  Of the 121 paragraphs of New York Life's Rule 56.1 Statement in support of its summary judgment motion, Gold responded "undisputed," at least in part, to 111.  A861-934.  Review of the other ten paragraphs reveals that he did not really dispute those facts, but merely recharacterized them.  A861-934 (recharacterizing ¶¶6, 21, 47, 49, 68, 80, 81, 82, 87 and 107).  Gold appears to argue – as he did to the trial court – that it is for a jury to interpret whether those undisputed facts render him an exempt employee.  That, however, fell within the province of the district court, which correctly held that those facts placed Gold comfortably within the outside sales exemption.

Gold's job was to sell insurance products.  Interactions with customers regarding their insurance needs sometimes involves some modicum of "advice," but the record below left no dispute that all such interactions had a singular goal of making appropriate sales.  Indeed, the only task from which Gold could generate any compensation was making a sale.  A898(¶50) (admitting that "Gold's analysis of which products were appropriate for a customer's needs was part of building trust with the customer and making legal and ethical sales).  Gold had but one

6

primary duty – to *sell* New York Life products.  As Judge Pauley correctly observed in <u>Chenensky</u>, Gold's "advice did not alone earn commissions for him – it was simply one mark of a good salesman."  <u>Chenensky v. New York Life Ins. Co.</u>, No. 07-11504, 2009 WL 4975237, at *6 (S.D.N.Y. Dec. 22, 2009).  The district court's holding that Gold was an exempt outside salesperson is unassailable.

## II.    The Manner In Which New York Life Compensated Gold Did Not Violate New York Labor Law § 193.

Gold attempts to craft a contract-based theory under Section 193 based solely on his Agent Contract and the accompanying Training Allowance Subsidy Agreement ("TAS Agreement").  However, he has not meaningfully explained how the district court erred in finding ambiguity in those contracts.  For this reason alone, this Court can affirm the denial of Gold's summary judgment motion.  In reality, moreover, Gold's argument disregards what the district court described as a "patchwork of agreements" composed of not just the Agent Contract and the TAS Agreement, but also a series of other agreements through which Gold further agreed to apply certain expense debits to his ledger as part of the determination of his periodic take-home pay.  Consideration of that complete record actually justifies entry of judgment for New York Life.

<u>Pachter</u> precludes Gold's wage deduction claim.  In <u>Pachter</u>, the New York Court of Appeals held that an employer and employee may agree to a commission-based compensation system that applies negative adjustments for business expenses

against the employee's commission credits from completed sales to reach a net compensation amount. Where the parties reach such an agreement, through words or conduct, the negative adjustments are <u>not</u> wage deductions under Section 193.

Gold's compensation arrangement is on all fours with <u>Pachter</u>. Gold understood precisely how his compensation worked and acquiesced in that system for years. Therefore, the denial of Gold's summary judgment motion should be affirmed because the facts do not support judgment for Gold, and on the alternate ground that judgment should enter in favor of New York Life.

## III. The District Court Properly Refused To Apply The Wage Theft Protection Act Retroactively.

The New York legislature has amended NYLL §198(1-a) twice since Gold filed suit, most recently via the Wage Theft Protection Act of 2010 ("WTPA"). A1548-49. Those amendments were not retroactive. As noted by the district court (and every other district court to reach the issue), the text and legislative history of the WTPA, as well as the absurd results that retroactivity would cause, show that the legislature intended the amendment to apply only prospectively.

## IV. The District Court Properly Dismissed The Action Under CAFA's Home State Exception.

Congress sets the bounds of federal court jurisdiction. In enacting the home state exception, Congress mandated that "[a] district court **shall decline** to exercise jurisdiction" over a class action in which (1) greater than two-thirds of the putative

8

class and (2) all of the primary defendants are citizens of the state where the action

was filed.  28 U.S.C. § 1332(d)(4)(B)(emphasis added).  Gold does not dispute that

more than 80% of the putative class and all of the defendants are New York

citizens.  A1607-09.  Thus, Gold cannot show that the Court committed either clear

legal error or an abuse of discretion by dismissing the action.

## STATEMENT OF FACTS

**I.    The Terms of Gold's Affiliation With New York Life Are Contained In What The District Court Described As A "Patchwork of Agreements."**

New York Life Insurance Company is a mutual insurance company that sells

life insurance, annuities, and other financial products through its agent sales force.

A861(¶1).  Gold was a New York Life Training Allowance Subsidy ("TAS") agent

from December 26, 2001 to October 2004.[4]  A861(¶4).  He purports to represent a

class of New York Life TAS Agents employed in New York between April 2, 2003

and the present.  A27(¶1).  More than 80% of the putative class members are New

York citizens.  A1606-08.

When joining New York Life, Gold executed an Agent's Contract and a TAS

Agreement addendum memorializing the terms of his engagement.  A864(¶5).  He

agreed to participate in New York Life's sales and product training for three years

---

[4]  TAS Agents generally are new agents with little prior experience in the insurance business who must attend regular meetings and agent training for their first 37 months, after which they may become independent contractor agents. A367(¶5,6).

while actively selling New York Life products.  A865(¶6).  He acknowledged that his New York Life compensation would be in the form of commissions and other allowances based on his sales production, not hours worked.  A866-67(¶¶7, 8).

Gold also entered into several written enrollment agreements for New York Life programs pursuant to which the Company provided services, and Gold expressly authorized New York Life to debit the corresponding expenses from his ledger.  See, e.g. A307 (telephone equipment and service), 311-12 (office rent), 591 (field technology).  In these agreements, Gold expressly agreed that the expenses would be applied as debits (downward adjustments to the balance) on the ledger established pursuant to the TAS Agreement.  Id., A1432(¶46).

## II.    Gold Was A Salesperson.

### A.    Gold Was A Licensed And Registered Insurance Salesperson Who Obtained A Securities Registration; He Was Not A Stockbroker Or Financial Advisor.

Gold held insurance licenses that authorized him to sell traditional life insurance and annuity products.  A867-68(¶10).  Four months into his TAS affiliation, he obtained Series 6 and Series 63 securities licenses that allowed him to use the title "registered representative" and to sell variable life insurance, mutual funds and certain other products with investment components (so-called "registered products") regulated by the NASD (now FINRA).  A868-69(¶¶11, 13).  Unlike a financial advisor or wealth manager, Gold never obtained the more advanced Series

10

7 securities license.  A871(¶15).  He was never a certified financial planner,

portfolio manager, financial advisor, or wealth manager.  A871(¶14).  Unlike a

stockbroker or wealth manager, he could not and did not recommend or sell

individual stocks or manage assets for a fee.  A871(¶16).

Gold admits that his job involved selling life insurance, long-term care

insurance, annuities and mutual funds.  A873-74(¶20-21).  He identified his

occupation as "insurance salesman" on his tax returns.  A138.  Over 90% of his

sales were of traditional (i.e., non-registered) life insurance products – mostly term

life insurance.  A875-77(¶22-24).  He did not need an NASD registration to sell

such products.  Id.  Gold generated less than 3% of his New York Life commissions

from the sale of mutual funds.  A877-78(¶24-27).

### B.    Gold's Duties Revolved Around "The Sales Cycle."

Even before Gold began his affiliation with the Company, New York Life

informed him that his "career will consist of a pattern of activities that make up a

selling cycle" known as "the life insurance sales cycle."  A879(¶29).  The Sales

Cycle consists of six phases of the insurance selling process:

- o  Phase one:  "Prospecting" involved seeking new customers who might be interested in the products that he had to offer.

- o  Phase two:  "The approach" involved contacting prospective customers, breaking the ice and arranging in-person sales meetings to explore their needs for products he sold.

- o  Phase three:  "Fact-finding" involved learning the customer's financial situation and goals to determine which New York Life products he could

11

recommend for their purchase. Gold gathered information and reviewed the customers' needs "to properly guide [them]" and "when the sale is proper to recommend it." Gold was "looking for holes" that could be plugged with the products he sold.

o Phase four: "Presenting a solution" involved meeting with customers to present the available product alternatives (e.g. term life insurance), explain their costs, and show how the products fit the customers' budgets and protected their interests. Gold reconfirmed how much the customers were willing to pay and helped the customer decide to buy.

o Phase five: "Closing" involved "asking the customer to buy" and getting a purchase commitment. He then took the customer's order by helping complete the application and submitting it to New York Life.

o Phase six: "Delivery and Continuing Service" involved physically delivering the policy, reviewing the policy and asking for leads – names of friends or relatives to whom Gold could try to sell more products.

A879-900(¶30-55). New York Life provided the following visual depiction of the

sales cycle:



A377-78(¶30) (emphasis in original).

Gold followed the same Sales Cycle whether selling traditional or registered products.  A886(¶33).  The only distinction was that he had to satisfy additional NASD regulatory prerequisites when selling registered products.  Id.

### C.    New York Life Recruited, Hired And Trained Gold To Sell.

New York Life seeks candidates with the potential to be good salespeople – candidates who possess strong communication and people skills, are self-motivated, can work independently and display initiative.  A900(¶56).  New York Life explains to candidates that the job is a sales position.  A879(¶29); A901(¶57).  Gold concedes that he was told that his responsibilities would be to "go out, meet people" [and] "close deals."  A901-02(¶57-58).

Gold attended weekly sessions where he learned how to identify potential customers, what products New York Life had for sale, how to determine the products that customers might want to purchase and how to persuade customers to buy.  A902-09(¶59-72).  He received sales training through the NYLIC University training program and from partners at the office where he worked.  Id.

At NYLIC University, Gold studied training modules such as "Introduction to a Sales Career with New York Life."  A903(¶62).  The courses provided Gold with "knowledge of the sales process" of which the Sales Cycle is the "core." A903(¶63).  The training taught Gold, *inter alia*, how to (i) use the telephone to schedule appointments; (ii) approach prospective customers; (iii) handle rejection;

13

(iv) answer objections in a closing interview; and (v) close sales. A904-07(¶64-68). Using what he learned, Gold engaged in one-interview and multiple-interview sales. A908-09(¶¶69-72).

### D.    <u>Making Sales Was How Gold Retained His Job And Got Paid.</u>

New York Life made it clear to Gold that his job was to sell. Gold received copious materials describing agents as a "sales force," "salespersons" and "sales professionals." A909(¶73). Likewise, the Company informed him that his pay and continued affiliation depended upon his sales. A911-15(¶¶74-79).

Gold did not engage in general marketing activities for New York life nor did he market for the benefit of other agents. A911(¶75). He directed his promotional activities toward consummating his own sales. A911(¶¶76-77). Gold had no illusions about receiving hourly, let alone overtime, pay. A911(¶78). He understood that he would generate commission and incentive compensation credits, through the ledger system, based solely upon his sales production. Id.

New York Life required Gold to meet minimum sales production standards both to maintain his affiliation and qualify for additional incentive compensation. A914-15(¶80-83). The Company also rewarded him for hitting sales targets, such as awarding him a Centurion Award for making 100 sales in one year. A915(¶84). Gold received no pay for providing advice to customers. A912-21(¶¶78-79, 97; A74(Gold tr. 58:22-62:12).

14

**E.    Gold Worked Outside New York Life's Offices And Was Not
Subject To Direct Or Constant Supervision.**

Gold regularly met with clients outside the office.  A917(¶89).  Work he
performed in the office – such as calling prospects to schedule appointments,
making copies and completing paperwork – was incidental to his sales.  A917(¶91).
With the exception of scheduled training, Gold generally determined his own
schedule and worked the hours he wanted.  A916(¶86).  Indeed, he chose not to
perform any work from July to September 2004, without consequence until his sales
production dropped below his contractual requirements.  A916-17(¶¶87, 88).

**F.    Gold's Inadmissible Expert Report.**

Gold proffers the report of David Denmark opining on the ultimate <u>legal</u>
issue of whether Gold's primary duty was sales.  Denmark never spoke to Gold.
A348-349 (Denmark tr. 60:17-61:3).  He did not know what products Gold sold,
how often he sold registered products, what questions he asked of customers, or
what his actual duties were.  A349 (Denmark tr. 62:3-63:3).  Denmark did not opine
regarding Gold's specific circumstances, but only as to his general understanding of
the duties of "registered representatives" in the financial services industry – not
even insurance agents in the insurance industry.  A350 (Denmark tr. 94:23-96:24).

Denmark has **never**  (i) been an insurance agent; (ii) sold insurance; (iii)
worked for an insurance company; (iv) witnessed an insurance agent work; (v)
spoken with a New York Life agent; (vi) been a registered representative; (vii) sold

15

securities; (viii) worked for the department of labor; or (ix) reviewed any testimony in this case.  A345-47 (Denmark tr. 38:21-39:16; 43:7-45:11).  Denmark merely reviewed the FINRA Rules (available online), Gold's declaration – which he did not understand [A355 (Denmark tr. 176:25-180:4)] – and regulatory requirements pertaining to individuals selling for NYLIFE Securities.  A350 (Denmark tr. 95:15-96:24).  Denmark could cite to no accepted measurements supporting his conclusions, stating only that he reached them based on his years of providing compliance advice in the "*financial services*" industry.  A351-54 (Denmark tr. 99:5-103:5; 134:15-137:25).

### III.    Gold's Ledger-Based Compensation.

New York Life paid Gold through a ledger-based compensation system.

A918(¶92).  The TAS Agreement lays the foundation for the ledger, providing:

> A ledger account, herein referred to as the Agent's ledger, will be established for the Agent.  Appropriate credits and debits will be entered on the Agent's ledger in accordance with this Agreement and the Company's rules and procedures concerning the administration of the Agent's ledger. For purposes of this Agreement, commissions are credited to an Agent's ledger only after the required premiums have been received and applied at the Company's Home Office.

A1432(¶46).

Consistent with this contractual language, New York Life established a ledger for Gold upon which it entered credits and debits, the reconciliation of which determined his compensation.  A919-21(¶¶93-95); A1412(¶12).  Gold understood

this system, testifying as follows:  "The ledger compensation – the ledger system worked that if – if the debit – if the credits were greater than the debits, then you're – then you're – then you're going to get – cut a check every month.  The ledger compensation system worked that if you got a – if you had a credit at the end of the month, you got a check."  A921(¶96).

New York Life entered credits on Gold's ledger for commissions and incentive payments derived from his sales.  A1412(¶13).  Typically, New York Life determined commissions on an annualized basis, even though customers often paid their premiums on a monthly basis.  That meant that when a customer paid the first month's premium, the Company advanced the full First Year Commission amount to Gold's ledger.  New York Life did so on the assumption that the product would remain in force and the customer would pay the full first year premiums for the policy over the course of the next twelve months.[5]  A923(¶¶100-01); A1453-54(¶¶87-91).  If a customer later ceased paying the first-year premiums, the Company reversed the corresponding commission advance by debiting that amount from Gold's ledger.  A923(¶¶102-03).  Gold understood that commissions posted to his ledger were not earned at the time of posting and that they would be reversed if

---

[5]  The majority of Gold's commission credits were advanced or annualized.  FYC entries with the designation "C," "Q" and "M" in the HP column are annualized commissions credited because the customer prospectively agreed to pay the corresponding premiums on a "Check-O-Matic," "Quarterly" or "Monthly" basis.  A1488-89(Commission Manual); A1136-37 (Gold ledger statement).

17

the policies did not remain in force (i.e., did not stay premium-paying) for the first

year.   A925(¶106) (Gold testified that such reversals were "part of the deal").

New York Insurance Law § 4228 sets the maximum percentage of insurance

premiums that insurers can pay agents for selling individual life insurance policies.

Therefore, by law, New York Life must make reasonable efforts to reverse

commission advances paid to agents for policies on which premiums are unpaid or

refunded.  A926(¶107); NY Gen. Counsel Op. No. 11-29-88, 1988 WL 1502891.

Even after a full year has passed, circumstances may require New York Life to

reverse commissions previously credited to an agent's ledger.  A926(¶108).  For

example, in the event of a death claim, if it is determined that a policyholder

misrepresented material facts in connection with his application, New York Life

may rescind the policy, refund premiums to the policyholder or beneficiary and

reverse the corresponding commissions paid to an agent.  A927(¶¶109-110).

Similarly, if a customer complains that an agent misrepresented facts at the time of

the sale, the company may elect to rescind the policy, refund the paid premiums and

reverse corresponding commissions.  Id.  Gold understood that such reversals could

occur and were part of his compensation arrangement.  A927(¶¶110-11).

Gold also entered into several written enrollment agreements through which

he expressly authorized New York Life to debit certain expenses on his ledger.  See

e.g., A307, 311-12, 591.  Gold understood that those items would appear as debits

on his ledger and that his periodic compensation would be the net of credits and debits posted to the ledger.  A121-22 (Gold tr. 314:7-320:22).

New York Life did not match up particular debits against any particular credits in the ledger reconciliation process.  A932(¶118).  Rather, the debits posted to his ledger were reconciled against the existing ledger balance on a rolling basis. Id.  Twice per month, New York Life paid Gold the positive balance on his ledger, if any.  A932(¶117); A1413(¶16).

Gold could access his ledger online 24-hours a day/7 days per week.  He received biweekly ledger statements reflecting the credits and debits applied to his ledger.  A932(¶119).  Gold never objected to the practice of reconciling his debits and credits to determine his compensation.  A933(¶121).  He admits that New York Life paid him everything it promised to pay under the ledger-based compensation system, contending only that the system itself was unlawful.  A124(Gold tr. 326:15-328:4) (Q. Put aside whether that system itself is lawful or not, you were not aware of any situations where you did not receive the amount of money that New York Life said it would pay pursuant to its compensation system, correct? A. Correct.).

## ARGUMENT

**I.    The District Court Properly Dismissed Gold's Overtime And Minimum Wage Claims Because Gold Was An Exempt Outside Salesperson.**

### A.    <u>The Purpose And Elements Of The Outside Sales Exemption.</u>

In the midst of economic crisis, massive unemployment, and oppressive labor

conditions, Congress sought to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).  The Fair Labor Standards Act ("FLSA") pursued that objective by proscribing child labor, imposing a minimum wage for most jobs, and establishing a general rule that individuals working more than forty hours per week were entitled to time-and-one-half pay for those additional hours.  29 U.S.C. § 201 et seq.

To avoid unintended effects on individuals and industries that were not engaged in the targeted oppressive labor practices, Congress made the general overtime rule subject to a number of exemptions.  See 29 U.S.C. § 213.  Congress exempted outside salespersons because hourly standards "primarily devised for an employee on a fixed hourly wage" are incompatible with the "individual character of the work of an outside salesman" who "works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day."  Jewel Tea Co. v. Williams, 118 F.2d 202, 207-08 (10th Cir. 1941); 29 U.S.C. § 213(a)(1). As the Tenth Circuit noted:  "Such salesmen, to a great extent, work[ ] individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation."  Jewel Tea

20

<u>Co.</u>, 118 F.2d at 208.

> An outside salesperson is an employee:
>
> > (1) Whose primary duty is: (i) making sales within the meaning of Section 3(k) of the [FLSA]; or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> >
> > (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.500.[6]

Determining "primary duty" under the first prong[7] requires the identification of "the principal, main, major, or most important duty" that the employee performed based on "all the facts in [his] particular case, with the major emphasis on the character of the [] job as a whole."  29 C.F.R. § 541.700.  Work performed "incidental to and in conjunction with" the employee's own sales or solicitations and "work that furthers [his] sales efforts" is exempt work.  29 C.F.R. § 541.500(b).

**B.    Gold's Primary Duty Was Selling.**

There is not a single dispute regarding what tasks Gold performed on a day-to-day basis.  Gold admits that he worked on his own schedule and engaged in the activities of the Sales Cycle and that he was paid and maintained his affiliation with

---

[6]  Gold concedes that New York's wage laws are defined and applied in the same manner as the FLSA and incorporate the outside sales exemption.  Gold Br., p. 5.

[7]  Gold concedes that he was customarily and regularly engaged away the office in performing his sales.  A917(¶89).  Accordingly, we do not address the second prong further herein.

New York Life only if he sold New York Life products.  A861-934(¶¶23-25, 43,

57, 61-72, 79-82).  Gold further concedes that he held a "unified set of work

activities."  Gold Br., p. 50.  He did not split his role between making sales at some

times and performing office management responsibilities at other times.  He had but

one role.  That left but one question for the district court to decide – did Gold's

sales activities exempt him from the overtime and minimum wage laws because he

was an outside salesperson?  See Icicle Seafoods v. Worthington, 475 U.S. 709, 714

(1986) (the question of how an employee actually spent his workday is one of fact,

but the question of whether those activities render him exempt is one of law);

Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (resolving

primary duty issue as a matter of law); Reiseck v. Universal Commc'ns of Miami,

Inc., 591 F.3d 101 (2d Cir. 2010) (same); Freeman v. Nat'l Broad. Co., 80 F.3d 78

(2d Cir. 1996) (affirming summary judgment on legal issue of whether duties

qualified for professional exemption).

     The United States Supreme Court recently confirmed that the test for

determining whether an employee is engaged in sales is "functional," focusing on

the "capacity" in which the employee is employed in the industry at issue.

Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2160 (2012)

pharmaceutical sales representatives bearing all the external indicia of salespeople

were outside salespersons); see also Reiseck, 591 F.3d at 106 (applying functional

analysis to conclude that employee whose primary duty was selling advertisement space was an outside salesperson).

Consistent with Christopher and Reiseck, the first step in analyzing Gold's "primary duty" involves an examination of whether he had the hallmarks of a salesperson, including whether he (1) generated commissions for himself through his work, (2) was hired and denominated as a salesperson, (3) received sales training, (4) devoted a significant amount of his time to exempt work, (5) enjoyed loose supervision (6) independently solicited new business, and (7) performed work unsuitable to an hourly wage.  See e.g. Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 398 (9th Cir. 2011), aff'd, 132 S. Ct. 2156 (2012), citing Jewel Tea, 118 F.2d at 208; Lane v. Humana Marketpoint, Inc., No. 09-380, 2011 WL 2181736 (D. Idaho Jan. 3, 2011) (evaluating factors to conclude Medicare product sales representatives were outside sales-exempt).

The district court correctly held that Gold directed all of his work activities toward closing sales, primarily of insurance products.  SPA8.  His workday followed the Sales Cycle.  A377-379(¶¶29-33).  The objective of each step of the Sales Cycle – making a sale – defined Gold's primary duty.  A898(¶50); see, e.g., Christopher, 132 S. Ct. at 2163 (noting that the objective of employees' duties was to obtain commitments); Fields v. AOL Time Warner, 261 F. Supp. 2d 971, 975 (W.D. Tenn. 2003) (the purpose of the tasks is dispositive); Pontius v. Delta Fin.

Corp., No. 04-1737, 2007 WL 1496692, at *9 (W.D. Pa. Mar. 20, 2007) (examining the purpose of the employee's tasks, noting "[a] distinction between the tail and the dog is fundamental to application of a regulation that bases exemption from overtime compensation on the nature of the employee's 'primary duty'").

Gold prospected to find customers "who might be interested in the products New York Life has to offer." A886(¶32). He gathered and analyzed information to build trust and determine which products to recommend. A887(¶¶ 35, 37); A898(¶50). He presented solutions to help customers decide to buy from him. A893-97(¶¶46-50). He closed sales to make money and he provided continuing service in the hope of getting referrals. A899(¶55).

Those admissions confirm the obvious – the *Sales* Cycle was not a process for doling out advice.[8] The end goal was making sales. Any advice that Gold provided as part of the Sales Cycle was secondary to potential customers, to New York Life, and to Gold himself. Indeed, if Gold did not make a sale, the customer would have no protection against the risk associated with loss of life, the company

---

[8] Those undisputed facts align Gold with others whom courts have deemed outside sales-exempt as a matter of law. See, e.g., Gregory v. First Title of Am., Inc., 555 F.3d 1300, 1302-03 (11th Cir. 2009) (marketing executive who persuaded clients to place orders and was paid based on orders she obtained); Stevens v. SimplexGrinnell, LLP, 190 F. App'x 768, 772 (11th Cir. 2006) (sprinkler company employee whose pay and performance depended on making sales); Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747, 756-57 (W.D. Mich. 2003) (field representatives recruiting students to school); Hodgson v. Krispy Kreme Doughnut Co., 346 F. Supp. 1102, 1103 (M.D.N.C. 1972) (driver-salesmen).

would receive no revenue, and Gold would have no paycheck.

As the Sales Cycle reflects, the recipe for sales has multiple ingredients, one of which is useful advice to potential customers about purchasing insurance and possibly other products.  That common sense reality comports with the FLSA rules, which define "work performed incidental to and in conjunction with the employee's own outside sales or solicitations" and "work that furthers the employee's sales efforts" as exempt work. 29 C.F.R. § 541.500(b).  Even when Gold's customer interactions did not prompt an immediate sale, they were, at the very least, "incidental to or in conjunction with" making sales and constitute exempt work.  29 C.F.R. § 541.500(b); A898(¶50); Chenensky, 2009 WL 4975237, at *5-6.

That Gold only got paid and maintained his affiliation if he made sales plainly shows that selling was his primary duty and that he was exempt under the express language of the regulations and the spirit and purpose of the outside sales exemption.  See, e.g., Gregory, 555 F.3d at 1308-09 (exemption applied where plaintiff (i) obtained title insurance orders; (ii) promoted the business to obtain orders; and (iii) received commissions from orders he obtained); Stevens, 190 F. App'x at 772 (customer service leading to sales and commissions incidental to sales); Taylor v. Waddell & Reed, Inc., No. 09-2909, 2012 WL 10669, *3 (S.D.Cal. Jan. 3, 2012) (regarding outside sales-exempt financial advisors: "making sales was obviously paramount to their success, since their earnings were based entirely on

25

sales commissions"); <u>Schmidt v. Eagle Waste & Recycling, Inc.</u>, 599 F.3d 626, 631 (7th Cir. 2010) (marketing material design and customer service incidental to sales).

### C.    Gold's Sales Techniques Did Not Alter His Primary Duty.

Whether Gold sold widgets or insurance, if selling was his primary duty, he was exempt.[9]  And while the record reflects that Gold was the quintessential salesperson, as this Court observed in <u>Reiseck</u>, even if the business at issue is not "the archetypal businesses envisaged by the FLSA . . . a careful consideration of [New York Life's] business model provides some clarity."  <u>Reiseck</u>, 591 F.3d at 106.  Here, there is no conceivable dispute that Gold's mission was selling New York Life's products.

Likewise, nothing in the exemption suggests that method of sale – how one persuades customers – bears upon whether the primary duty is selling.  The law draws no distinction between hard-selling peddlers and, as here, an agent who sells by asking questions to determine a customer's needs, gain trust and sell suitable products.  DOL Opinion Letter FLSA2009-28 (Jan. 16, 2009) ("DOL Agent Letter"), A595 (agents conducting research "to select the specific types and

---

[9]  <u>See, e.g.</u>, <u>Schmidt</u>, 599 F.3d 626 (employee contacting prospects, convincing them to use disposal services, negotiating prices, and providing service was outside sales exempt); <u>Jewel Tea</u>, 118 F.2d at 204 (salaried sundry salesmen exempt); <u>Olivo v. GMAC</u>, 374 F. Supp. 2d 545, 550-51 (E.D. Mich. 2004) (loan officers originating home equity loans were outside sales exempt); <u>Fields</u>, 261 F. Supp. 2d at 977 (employees selling cable subscriptions, auditing cable lines, and collecting delinquent accounts were exempt).

26

amounts of insurance products to recommend and sell to clients to best meet the client's needs" are outside sales-exempt); DOL March 2010 Interpretation, A356-63 (mortgage loan officers responsible for collecting financial information – including income, assets, investments, etc. – assessing the suitability of loan products and matching the customer's needs with one of the company's products were primarily engaged in sales); <u>Bouder v. Prudential Fin. Inc.</u>, No. 06-4359, 2010 WL 3515567 (D.N.J. Aug. 31, 2010) (registered representative insurance agents similar to Gold were outside sales-exempt); <u>Taylor</u>, 2012 WL 10669 (FINRA-regulated financial advisors selling securities were outside salespersons).

### D.    Gold's Registered Representative Status Did Not Alter His Exempt Status.

Gold was an insurance agent who happened also to be a "registered representative" for part of his tenure with the company.  "Registered representative" is a designation used in the financial services industries by individuals holding securities licenses, whether they are stockbrokers or insurance agents.  Because that title is used broadly to cover a wide range of individuals in diverse professions, it provides no insight into the employee's actual job duties.  From December 2001 to April 2002, Gold was an agent without any securities registration and, therefore, he could not sell products requiring such a registration.  A864-68(¶¶5-11).  After Gold passed his Series 6 and 63 exams, he was an insurance agent able to hold himself out as having a registered representative designation.  <u>Id.</u>  The only difference was

27

that he now could, and occasionally did, sell products with a risk-component that only a registered representative may sell, such as mutual funds. A868-71(¶¶11-16). Obtaining a securities registration did not alter Gold's primary duty – it was sales before and after April 2002. At no time did Gold provide advice or services for a fee, nor did he ever get paid for assets under management. A871(¶16). He sold products; nothing more. A873(¶20), A877(¶23-26).

Nonetheless, Gold cites a report by his "expert," who abstractly opined that insurance agents who also are registered representatives do not have a primary duty of selling.[10] Gold Br. 14. The district court rejected that opinion, as should this Court. SPA8-9. This case concerns Gold's duties – not some hypothetical agent performing duties similar to a financial advisor providing fee-based financial advice. See, e.g., 29 C.F.R. § 541.2 (exempt status must be determined based on the particular employee's duties); Fields, 261 F. Supp. 2d at 975 (the "actual job duties and actions performed by the employee are dispositive").

There is a complete disconnect between what Gold actually did selling

---

[10] The district court properly discounted the expert's opinion, which fails to satisfy Feder Rule of Evidence 702. SPA8-9. It is not grounded in fact and it impermissibly opines on the ultimate legal issue in the case. See Henry v. Quicken Loans Inc., No. 04-40346, 2009 WL 3199788, at *5 (E.D. Mich. Sept. 30, 2009) (report as to employee's primary duty in administrative exemption case excluded as a legal conclusion); Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997) (excluding expert conclusion, noting that the "courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards").

products for New York Life and his expert's generalized notions about "registered representatives" typically having advisory duties. Gold and his expert used the terms "registered representative" and "financial services" broadly to encompass everyone from financial advisors to stockbrokers to insurance agents, in the hopes of obscuring Gold's actual duties.

The district court discerned the superficiality of that argument and correctly held that Gold could not escape that he was an insurance agent through and through. SPA5-11. He sold insurance (over 90% of his sales were of life insurance policies), followed the Sales Cycle, had to meet minimum production standards and only generated commission credits upon closing sales. A875-914(¶¶22-27, 31, 77-79). That he also held Series 6 and 63 registrations did not convert his primary duty from selling to advising. In fact, Gold did not even need an NASD registration to sell 95% of the products he sold, and he engaged in the same sales cycle regardless of what type of product he sold.[11] A875-86(¶¶22-27, 33).

Moreover, even if Gold had to follow NASD requirements in every sale, that would not affect the "primary duty" analysis under the outside sales exemption. See Taylor, 2012 WL 10669 (FINRA-regulated financial advisors exclusively

---

[11] The distinction is that, for registered products, Gold had to obtain additional information so that New York Life could undertake a "suitability analysis" before Gold could make the sale. A1057 (Guide to Suitable Sales, noting that the agent's role is to collect information on the Investor Profile so that the company's systems can analyze the information and apply suitability standards).

selling securities were outside salespersons). Even non-registered insurance agents must comply with certain standards to ensure that they are not taking advantage of customers. For example, to ensure that policies being sold are suitable to the customer's circumstances, an insurance agent cannot sell life insurance until he has obtained and assessed certain information from a client, including the client's economic situation. Still, the Department of Labor recognizes that agents engaged in selling are exempt. A594-97. Such regulatory requirements do not alter the sales nature of the job; they are simply indispensable (and legally required) aspects of the sale itself. See, e.g., Christopher, 132 S. Ct. at 2165 (pharmaceutical sales representatives in a highly regulated industry are outside sales-exempt); Gregory, 555 F.3d at 1302-03 (sales in highly regulated title insurance industry).

Selling products only after determining what fits a customer's needs, whether because it is the right thing to do or because it is required by law, does not detract from the sales nature of the job. A595. It is just part of being an ethical salesperson. A898(¶50).[12]

### E. The District Court Correctly Observed That The DOL's Insurance Agent Opinion Letter Supports The Conclusion That Gold Was An Outside Salesperson.

Gold argues that the district court "disregarded" the DOL Agent Letter. Gold

---

[12] Even car salespersons, who are indisputably engaged in sales, abide by a code of ethics. See, e.g., National Automobile Dealers Association code of ethics, http://www.nada.org/AboutNADA/CodeofEthics. That does not make them any less engaged in sales.

30

Br. at 44.  The district court disregarded nothing.  Rather, it correctly held that the

DOL Agent Letter supports the conclusion that Gold was a salesperson.  SPA10-11.

The DOL Agent Letter drew a distinction between what it characterized as

Group 1 and Group 2 agents, as follows:

> **Group 1:** "… the <u>primary duty of insurance agents in group (1) is to make sales</u> and obtain orders for life insurance and other insurance and financial products and services.  These sales are made directly to clients, primarily through face-to-face meetings at the clients' homes or places of business."  A594.

> **Group 2:** "… <u>although the agents in group (2) make some sales, their primary duty is to service the insurance company's business</u> and advise clients on various insurance and financial products, taking into account the agent's knowledge of the needs, goals, and risk tolerance of each client, as well as the agent's knowledge and experience with the insurance industry and market."

A596 (emphasis added).   The DOL Agent Letter then held that Group 1 agents

doing **<u>exactly</u>** what Gold did are exempt outside salespersons.  A594-97.  Group 1

agents' duties track the New York Life's Sales Cycle to a "T," including:

- Originating his own sales by contacting prospects, developing and maintaining relationships with referral sources and creating promotional activities.  A595; A877-78(¶¶34-38; A911-12(¶¶76-78).

- Communicating with customers as an adjunct to in-person sales calls.  A595-96; A595; A888-89(¶¶39-40).

- Regularly meeting customers face-to-face to sell insurance.  A594; A917(¶¶89-91).

- Conducting research to select types and amounts of insurance products to recommend and sell to meet customers' needs (i.e., "fact-finding").  A595; 889-98(¶¶42-50).

- Receiving sales, product and regulatory training.  A595; A902-09(¶¶59-72).

31

- Spending the majority of his time performing tasks directly related to his own sales activities.  A594; A377-79(¶¶29-33); A879-87 (¶¶29-33).

- Setting his own schedule, operating his day-to-day business without daily supervision, and getting paid on commissions.  A595.

Gold was, by no means, a Group 2 "administrative" agent.  Group 2 agents are marketing agents, focused on generally promoting the company's brand and maintaining the company's business relationships.  A598.  They may "make some sales" secondarily but they are engaged primarily in servicing *the company's* business, promoting *the company and its products* and *providing advice* to existing company clients.  A594.  Reflective of their non-sales role, Group 2 agents received a salary for their services – not exclusively pay based on their own sales.  A598.

Gold, by contrast, independently sought new customers, promoted himself (not others) and sold insurance on his own account.  A873(¶20), A887(¶34-35), A911(¶76).  He received credit only for policies that he sold.  A911(¶75).  Unlike Group 2 agents who get paid regardless of their sales, Gold had to sell.  His income and continued affiliation depended on his personal sales success.  A86(Gold tr. 133:17-21); A912(¶77).  Gold received no pay simply for touting New York Life's good name.  See Casas v. Conseco Fin. Corp., No. 00-1512, 2002 WL 507059, at *9 (D. Minn. Mar. 31, 2002) (employees primarily engaged in sales where efforts were directed at selling loans to customers, not promotion); 69 Fed. Reg. 22145-46 (distinguishing Casas and other insurance industry cases, emphasizing difference

between employees who have a primary duty of sales and employees who promote

an employer's financial products generally, decide on advertising budgets, run an

office, service and advise existing customers).[13]  The district court correctly held

that Gold fell within the outside sales-exemption and, therefore, summary judgment

dismissing Gold's claims as overtime and minimum wage should be affirmed.

## II.    Gold's Compensation Did Not Violate NYLL § 193.

### A.    <u>Pachter</u> Permits Ledger-Based Commission Systems.

Section 193 generally prohibits an employer from "mak[ing] any deduction

from the wages of an employee."  NYLL § 193(1).  The question here is whether

New York Life's compensation system provides for deductions taken from an

employee's "earned wage" or, rather, is a system that reconciles certain negative

adjustments (debits) against commission credits as part of an agreed-upon

compensation formula.  Under <u>Pachter</u>, a reconciliation system like that used by

New York Life is perfectly lawful.

In <u>Pachter</u>, the employer credited the plaintiff with commissions based on her

---

[13]  Gold cites no outside sales case supporting his novel argument that engaging in needs-based selling rendered him non-exempt.  Rather, he relies on inapposite financial advisor and stockbroker administrative exemption cases that lend nothing to the analysis.  He relies upon <u>Hein v. PNC Fin. Services Grp., Inc.</u>, 511 F. Supp. 2d 563 (E.D. Pa. 2007), <u>In re RBC Dain Rauscher Overtime Litig.</u>, 703 F. Supp. 2d 910 (D. Minn. 2010), <u>Davis v. J.P. Morgan Chase & Co.</u>, 587 F.3d 529 (2d Cir. 2009) and the DOL Opinion Letter addressing financial advisors (A364-71).  The district court correctly rejected that line of authority because it does not address circumstances where a registered representative was primarily engaged in selling – as opposed to investment advising.  SPA7-11.

33

sales and debited from her total gross commissions "charges" for various expenses, including late payments, losses attributable to errors, a portion of her assistant's salary, uncollectible debts, travel and entertainment expenses, marketing expenses, and "miscellaneous expenses related to her work." Id. at 613, n.1; A1368-95. The court found no Section 193 violation because Pachter had agreed that the negative adjustments would be applied as part of determining her compensable earnings. Id. at 617-18 (employer and commissioned sales employee "are free to add whatever conditions they may wish to their agreement," including agreeing that the computation of earnings will include downward adjustments from gross commissions for business expenses and commission reversals).[14]

Pachter holds further that a written contract is unnecessary to establish the parties' compensation arrangement. In the absence of a clear written agreement, extrinsic evidence of the parties' communications and course of dealings governs whether computation of earnings included commissions and downward adjustments. Id. at 617-18. The Court specifically noted that where an employee "understood" and "acquiesced" in the practice of adjusting commissions before paying compensation, the employee is bound by an implied agreement that negative adjustments are part of the compensation formula. Id. at 618.

---

[14] Dean Witter Reynolds, Inc. v. Ross, 429 N.Y.S.2d 653 (1st Dep't 1980), also is instructive. There, the court upheld the lawfulness under Section 193 of negative compensation adjustments for items like long-distance service because they were part of the calculation of the employee's compensation.

The district court here correctly interpreted <u>Pachter</u> when it reasoned:

> But Plaintiffs misread <u>Pachter</u>. That decision does not require an employer to identify a specific time when a commission is earned. <u>Pachter</u> merely recognizes that if the parties agree that "computation of commissions[15] will include certain downward adjustments…the commission will not be deemed 'earned' or vested until computation of the agreed-upon formula." <u>Pachter</u>, 10 N.Y.3d at 617. Thus, the issue is whether the parties had such an agreement.

SPA24.

Having defined that correct path, the district court then observed, without explanation, that there were "genuine disputes of material fact" that potentially could support a finding in favor of Gold. The court, however, never identified what those supposedly disputed facts were. SA24 (noting that disputes of material fact exist, but identifying none). The district court was presumably focused on Gold's reference to snippets from his TAS Agreement and Agent's Contract that referred to commissions and other incentive payments being "payable" or "allowed" upon the occurrence of certain conditions. At most, that evidence raised a potential ambiguity regarding when individual credits entered on Gold's ledger would be earned absent a <u>Pachter</u>-like agreement. That, however, is immaterial in light of the undisputed evidence that Gold had agreed that his periodic take-home pay would be the sum of the credits and debits on his ledger. <u>Pachter</u>, 10 N.Y.3d at 617. In this

---

[15] As Gold acknowledges (at page 55 of his brief), <u>Pachter</u> used the term "commissions" in this context to refer to the net amount paid after expenses were debited – i.e., her compensation. <u>Pachter</u>, 10 N.Y.3d at 611 (noting that "commission earnings" were calculated after factoring in gross commissions, commission reversals and agreed-upon business expenses).

35

regard, the undisputed record reflects an agreement and understanding on Gold's part that just such a formula governed his compensation. That should have been the end of the story – and this case.

## B.     The Written Agreements Do Not Establish A Section 193 Violation.

Gold's summary judgment motion failed because he did not establish the existence of an unambiguous agreement precluding the reconciliation of negative debits against positive credits on his ledger. As noted by the district court, Gold's compensation arrangement was set forth in a "patchwork" of "several related agreements." SPA12. Read in context, those agreements confirm the exact opposite of Gold's argument – he agreed that his periodic compensation would be determined via reconciliation of ledger credits and debits.

References to "payable" commissions or "allowable" supplements in the Agent's Contract and TAS Agreement do not equate to "earned wages" from which Section 193 bars deductions. Those concepts are entirely consistent with posting credits to Gold's ledger and later reconciling debits against the ledger balance. The TAS Agreement states that commissions that Gold describes as "payable" will be "credited to an Agent's ledger" together with appropriate debits.[16] A1432-33(¶46)

---

[16] Gold conceded that certain credits referred to as "payable" in the TAS Agreement were "unearned" commission advances. A1461(¶18); A1528-29. Even absent a ledger-based compensation agreement, debits applied to those admittedly "unearned" amounts could not constitute a Section 193 violation.

(citing TAS Agreement, ¶9(b)).  Specifically, paragraph 9(b) states:

> A ledger account, herein referred to as the Agent's ledger, will be established for the Agent.  Appropriate credits and debits will be entered on the Agent's ledger in accordance with this Agreement and the Company's rules and procedures concerning the administration of the Agent's ledger.  For purposes of this Agreement, commissions are credited to an Agent's ledger only after the required premiums have been received and applied at the Company's Home Office.

A1432-33(¶46).  The TAS Agreement also includes **48** references to commissions and other items being "credited" and "debited" to the ledger.  That is how New York Life paid Gold throughout his tenure (without complaint).  Most importantly, this ledger-based system mirrors the lawful system endorsed in <u>Pachter</u>.[17]

In Gold's zeal to rewrite his compensation arrangement through litigation, he glosses over the multiple agreements he signed authorizing debits to his ledger for expenses associated with programs for which he enrolled.  A307, A311-12, A591. Each of those agreements specifies that New York Life will debit his ledger for the expense incurred.  <u>Id.</u>  Read as a whole, Gold's "patchwork of agreements" confirmed that his agreed-upon compensation included negative adjustments for commission reversals and expense debits.  They do not unequivocally prove that New York Life was precluded by law from reconciling negative adjustments against

---

[17] Pachter's employer posted "payable" commission credits and expense debits to her monthly statement.  At month-end, the employer reconciled credits and debits to determine her compensation.  <u>Pachter</u>, 10 N.Y.3d at 612.  If a commission credit turned out to be a bad debt in a later month, the employer entered a debit in that month despite its inclusion in the payable amount in a previous month.

37

Gold's compensation credits on his ledger.

### C.    Gold's Compensation and Pachter's Compensation Are Materially Indistinguishable.

The compensation arrangement between Gold and New York Life is materially identical to that which Pachter had with her employer. The following compensation statement provided to Elaine Pachter (nee Littman) illustrates that, like Gold, her periodic compensation was determined by reconciling the commission credits from her sales and miscellaneous business expenses charges:



A1133 (callouts added).  Comparing that statement with Gold's ledger statements

(A1136-37) shows the striking parallels between their compensation arrangements –

parallels that include:

| Pachter's Compensation | Gold's Compensation |
|---|---|
| Hodes credited Pachter with advanced and unadvanced sales commissions. Pachter, 10 N.Y.3d at 613. | New York Life credited Gold with advanced and unadvanced sales commissions.  A1459-61(¶¶10-19). |
| Hodes applied debits to Pachter's monthly compensation statements for travel, entertainment and marketing expenses, miscellaneous expenses related to her work that the company advanced and she had to repay, finance charges for client late payments, and chargebacks for client nonpayment and "bad debt."  Id. at 613. | New York Life applied debits to Gold's ledger on a rolling basis for expenses authorized by Gold in writing, including rent, professional liability insurance, telephone charges and technology expenses.  A1412-13(¶¶14-15); A1457-64(¶¶2, 26-29). |
| Hodes reversed previously advanced commissions from later compensation statements where the customer failed to pay the company.  Id. at 613. | New York Life debited previously advanced commissions on a rolling basis upon the customer's failure to pay the corresponding premium, policy rescission, etc. Id.(¶¶ 15-19). |
| Hodes did not match particular debits with particular credits on monthly compensation statements.  Id. at 613. | New York Life did not match particular debits with particular credits on Gold's ledger.  A1413(¶16). |
| Pachter received monthly compensation statements showing credits and debits applied to determine her overall compensation.  Id. at 618; A1368-95. | Gold had continual online ledger access and received biweekly ledger statements showing credits and debits applied to determine his overall compensation.  A1457(¶3); A1136-37. |

The only distinction Gold can discern from Pachter is that, unlike Pachter, he

signed written agreements.  Gold Br., p. 32.  That distinction, however, bolsters the

denial of Gold's motion for summary judgment.

The district court recognized that Gold had executed a "patchwork" of

39

"several related agreements" expressly authorizing New York Life to debit his

ledgers for expenses. The employer in Pachter could cite no such writings, relying

strictly on its practices, Pachter's monthly compensation statements and Pachter's

acquiescence to ascertain the parties' agreement. Yet, Pachter held that was good

enough for summary judgment in favor of the employer. Pachter v. Bernard Hodes

Group, Inc., 541 F.3d 461 (2d Cir. 2008) (on appeal of order granting summary

judgment to *plaintiff*, court ordered judgment to *defendant* after New York Court of

Appeals answered certified question).

Here, the district court only needed to evaluate the four corners of the

"patchwork of agreements" to find that Gold had agreed to a compensation system

that reconciled his positive compensation credits against expenses and other debits

(for reversals). His ledger statements and acquiescence confirmed that agreement.

Thus, the district court's denial of Gold's summary judgment motion was proper

and this Court can and should affirm on the alternative ground that, in fact, the

district court must enter judgment for New York Life as a matter of law.[18] See

---

[18] If anything, this case presents an even more compelling case for lawfulness under
Section 193 because Gold's legal theory that New York Life was not permitted to
adjust downward for expenses and reversals is irreconcilable with Insurance Law
§ 4228. Failing to make reasonable efforts to reverse commission credits in the
event of a rescission, policy cancellation, etc. would result in paying more than
the statutory commission cap. A1464-66(¶¶31-38). Consistent with New York
Life's legal obligation to reverse such commission credits, Gold withdrew his
advanced and annualized commission reversal claim. A1528-29.

Prisco v. A & D Carting Corp., 168 F.3d 593, 610 (2d Cir. 1999) (court may affirm

on any basis for which there is a record sufficient to permit conclusions of law).

### D.    Gold's Tax Treatment And Debt Recompense Arguments Do Not Support Partial Judgment In His Favor.

Gold argues that New York Life's tax-withholding based upon commission

credits establishes that New York Life considered commission credits "earned."

Contrary to Gold's argument, however, whether income is "gross income" or

"wages" for purposes of the Internal Revenue Code ("IRC") has nothing to do with

the Pachter analysis or whether income is "earned" under Section 193.

For example, if there was an express, integrated contract identifying all

components of Gold's compensation and specifying that New York Life and Gold

agree that his earnings would be the net of credits and debits on his ledger, Gold

would have no argument against Pachter's application.  Yet, the tax treatment of his

commissions would be the same.  There is a complete disconnect between the tax

treatment and the parties' compensation understanding.

Further, as the IRC and Section 193 each have distinct policy objectives,[19]

comparisons under and between these two separate bodies of law is unhelpful.  The

IRC requires that all amounts paid to an employee are subject to reporting and

withholding unless a specific exception applies.  26 U.S.C. §§ 3401(a), 3402(a); 26

---

[19] The IRC's wage reporting obligations are intended to avoid underreporting of pay and, therefore, it is not surprising that it contains a broad definition of "gross income" or "wages" that is not co-extensive with "wages" under Section 193.

C.F.R. § 1.6041-2.  Thus, all amounts credited to agents are reported and subjected

to withholding unless one of the narrow statutory or regulatory exceptions applies,

as with IRC section 401(k) plans.  See 26 C.F.R. § 1.401(k)-1(a)(4)(iii).

In light of the broad statutory definition of "income" under the IRC and the

absence of a specific statutory exception, New York Life reports as income all

amounts credited to agents to ensure compliance with applicable tax laws.  The

agent, of course, is free to submit all of his ledger and non-ledger business expenses

as deductions on IRS Schedule C (or Schedule A) of his tax returns.  A1478(Hynes

tr. 182:19-22).  Moreover, Gold's argument that if New York Life were to report

the credits and debits in a manner inconsistent with the IRC that Gold "would have

paid significantly less tax" (Gold Br. at p. 61, fn. 28) is entirely speculative and

irrelevant since the result is a consequence of the IRC, not any choice by New York

Life.

Further, Gold's arguments that the language in his Agent Contract regarding

New York Life's lien against compensation and its practice of seeking recompense

from agents for negative ledger balances (e.g., sometimes by separate check,

sometimes by collections actions) somehow alters his compensation arrangement is

another red herring.  That New York Life maintains a procedure whereby it may

seek reimbursement from agents for amounts overpaid through the ledger system is

neither surprising nor illegal.  First, that procedure is required to comply with the

commission limits imposed by N.Y. Insurance Law § 4228. Second, Gold admitted that New York Life paid advanced commissions and that those commissions were subject to lawful reversal if the underlying policy premiums were not paid. A1461(¶18); A1528-29. That practice creates a situation where an opportunistic agent could sell commission-generating policies to persons who end up not paying the full first-year premiums, after which the agent resigns from the company after receiving the advanced commissions.

Unless New York Life maintains a mechanism for recovering the amount overpaid to the agent, such events (or, sometimes, scams) could go unchecked. Consequently, New York Life reserves the right to seek recompense against an agent who departs with a negative ledger balance. There is nothing unlawful about that practice under Section 193 – or any other law. More importantly, Gold cannot use these arguments to explain away the sole fact that matters – he expressly agreed to the ledger-based compensation system pursuant to which New York Life paid him for the entirety of his tenure.[20]

### E.    Even If There Were Ambiguity In The Parties' Written Agreements, <u>Pachter</u> Dictates That Gold's Admissions And Acquiescence Bar His Claim.

<u>Pachter</u> further teaches that even if there were some ambiguity in the written

---

[20] While New York Life believes that Gold's tax-withholding and lien arguments are immaterial, if the Court were to disagree, at most they created a disputed issue of fact that requires affirmance of the holding below.

agreement between the parties (or no written agreement), an employee's acquiescence in how his employer pays him is dispositive evidence that the employer's payment method comports with the parties' understanding. <u>Pachter</u>, 541 F.3d at 464. Despite correctly interpreting <u>Pachter</u>, the district court did not address the issue of acquiescence against the backdrop of this case's factual record.

Tellingly absent from Gold's 97-paragraph statement of facts submitted in support of his summary judgment motion was any reference to his testimony or his complete acquiescence in the ledger-based compensation system for his three years as an agent (and four years thereafter before he filed suit). A1163-83. Gold's conduct and sworn testimony further support judgment against his deduction claim.

Gold admitted that he understood that (i) his compensation at New York Life would be the net of the credits and debits applied to his ledgers; (ii) the annualized commissions posted to his ledgers were not earned; (iii) he signed documents acknowledging his understanding the specific debits applied to his ledger; (iv) New York Life paid him through the ledger system throughout his tenure; (v) if a policy did not "hold up," the commissions would be reversed at such later date; (vi) in addition to nonpayment of premiums associated with advanced FYCs, there were other reasons why credits to Gold's ledger remained subject to reversal (e.g., failure to submit a policy delivery receipt or policy rescission); (vii) twice per month (or whenever Gold requested), New York Life provided him with ledger statements and

44

disbursed the net of the pending credits and debits through the ledger system; and (viii) he received every penny that New York Life promised to pay him pursuant to its compensation system.  A924-33(¶¶ 104-113, 118-121).

Gold's admissions that New York Life's payment practices comported with his understanding as to how he was to be paid, especially when combined with his complete acquiescence, are fatal to his Section 193 claim.

### F.    Gold's Company Store Argument Fails.

In his effort to evade the import of his understanding, Gold pivots to argue that his compensation arrangement is per se illegal under Section 193.  He does so by comparing himself to employees in turn-of-the-century "company stores."  Gold Br., p. 62.  Gold's argument finds no support in Section 193, Pachter or the facts.

Gold's misplaced reliance on Angello v. Labor Ready, Inc., 7 N.Y.3d 579 (2006), highlights his misunderstanding of Section 193.  Angello stands for the proposition that Section 193 protects the employee's compensation expectation. The laborers in Angello worked scheduled shifts for which their employer owed them an agreed-upon hourly wage.  Yet, when they collected their wages, the employer charged a processing fee, leaving them with less than their agreed-upon hourly wage.  7 N.Y.3d at 582.  Gold, by contrast, admits that New York Life paid him in full accord with his expectations.  A928(¶111); A124 (Gold tr. 326:15-328:4).

45

Angello and Pachter illustrate the important difference between time-based and commission-based compensation. In the former, as in Angello, an employee works a set time for an agreed-upon sum. Paying anything less than that sum is, in effect, a breach of a contract protected against by Section 193. Compensation for commissioned salespeople is not set based on units of time worked. Rather, that compensation is determined by whatever agreement the employer and employee have made. Because of that, lawful commission-based compensation systems may include reconciliation of business-related costs as part of determining earnings, whereas offsets cannot be made when calculating time-based wages. Pachter, 10 N.Y.3d at 617.

What's more, the Pachter court considered Angello and, nonetheless, held that some of the same types of so-called "company store" expenses that New York Life debited to Gold's ledger were perfectly lawful. See Pachter v. Bernard Hodes Group, Inc. Briefs, 2008 WL 2245786 (Reply Brief); 2008 WL 2245783 (Respondent's Brief); Pachter, 10 N.Y.3d at 618. That holding confirms that Gold's reliance upon Angello is wholly unfounded.

As the foregoing reveals, the district court correctly denied summary judgment to Gold, and the record supports remanding to the district court for entry of judgment against Gold's Section 193 claim.

46

### III.  The Text, History And Purposes Of The Liquidated Damages Amendment Confirm Its Nonretroactivity.

In 2009, the legislature shifted the burden of proof for liquidated damages underN.Y. Labor Law § 198(1-a) from requiring the employee to prove willfulness to requiring the employee to prove good faith.  2009 N.Y. Sess. Laws ch. 372 (McKinney's).  In December 2010, the New York legislature passed the WTPA, again amending Section 198(1-a) by quadrupling liquidated damages for wage violations.  The text of the amendment, which became effective on April 11, 2011, states:

> In any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, . . . and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to twenty-five one hundred percent of the wages found to be due.

2010 N.Y. Sess. Laws ch. 564; NYLL §§ 198(1–a), 663(1) (emphasis and strikethrough in the original).

Nothing in the WTPA, in the sponsor's memorandum or any drafts of the WTPA provides for retroactive application.  See 2010 N.Y. Sess. Laws ch. 564; N.Y. Spons. Mem. 2010 S.B. 8380; 2009 N.Y.S.B. 8380 (June 27, 2010).  Hence, every district court to address this issue has rejected retroactivity.  See, e.g., Wicaksono v. XYZ 48 Corp., No. 10-3565, 2011 WL 2022644 (S.D.N.Y. May 2, 2011); Benavidez v. Plaza Mexico, Inc., No. 09-5076, 2012 WL 500428 (S.D.N.Y.

47

Feb. 15, 2012); <u>Maldonado v. La Nueva Rampa, Inc.</u>, No. 10-8195, 2012 WL

1669341 (S.D.N.Y. May 14, 2012); <u>Ryan v. Legends Hospitality, LLC</u>, No. 11-

3110, 2012 WL 3834088 (S.D.N.Y. Aug. 1, 2012); <u>Marin v. JMP Restoration

Corp.</u>, No. 09-1384, 2012 WL 4369748 (E.D.N.Y. Aug. 24, 2012); <u>Zubair v.

EnTech Eng'g</u>, No. 09-7927, 2012 WL 4887738 (S.D.N.Y. Oct. 1, 2012).

    Moreover, there is a strong presumption against retroactivity that Gold can

overcome only by pointing to "a clear expression of legislative intent to apply a

statute retroactively." <u>McLean v. Garage Mgmt. Corp.</u>, No. 10-3950, 2012 WL

1358739, at *9 (S.D.N.Y. Apr. 19, 2012), <u>citing</u> <u>CFCU Comm. Credit Union v.

Hayward</u>, 522 F.3d 253, 262 (2d Cir. 2009), and <u>Landgraf v. USI Film Prods.</u>, 511

U.S. 244, 278 (1994) (rejecting retroactivity, noting that contrary presumption is

stronger when a new statute would increase liability for past conduct). No such

clear expression exists here.

    The only decision retroactively applying the WTPA is an unreported state

trial court decision in <u>Ji v. Belle World Beauty, Inc.</u>, No. 603882/2008 (N.Y. Sup.

Ct. Aug. 24, 2011). There, the court erroneously assumed that if a statute is

remedial, it automatically is retroactive. That is irreconcilable with this Court's

holding that "mere classification of a statute as 'remedial' does not automatically

overcome the strong presumption that statutes should be applied prospectively."

<u>CFCU</u>, 522 F.3d at 232; <u>see also</u> <u>Quintanilla v. Suffolk Paving Corp.</u>, No. 09-531,

48

2012 WL 4086805, at *4 (E.D.N.Y. Sept. 17, 2012) (noting how <u>Ji</u> "oversimplifies the analysis").

What's more, the statutory amendment quadrupling the available liquidated damages was punitive, not remedial. While the WTPA itself may be generally remedial, the amendment quadrupling liquidated damages was decidedly punitive. <u>See</u> <u>SEC v. Lorin</u>, 869 F. Supp. 1117, 1123 (S.D.N.Y. 1994) (statute authorizing government to pursue liability of up to three times the profit gained from insider trading was "punitive" rather than "remedial" because recovery was not limited to the damage caused or the wrongfully obtained proceeds).

Further, implied retroactivity would lead to illogical results. As noted above, the WTPA predicates recovery of 100% liquidated damages on the employer's failure to carry a burden of establishing "good faith." The requirement that the employer prove "good faith" to avoid liquidated damages (as opposed to the employee proving willfullness to obtain such damages) is the product of a 2009 amendment to the WTPA. 2009 N.Y. Sess. Laws ch. 372 (McKinney's). That amendment was expressly <u>non</u>retroactive. <u>Id.</u> § 4. It is inconceivable that the legislature intended the 100% liquidated damages provision to apply retroactively where the amendment that set the standard for imposing liquidated damages only applies prospectively. Accordingly, the district court's holding that the WTPA's 100% liquidated damages penalty does not retroactively apply should be affirmed.

49

## IV.    Dismissal Was Proper Under The Home State Exception.

"The CAFA mandatory abstention provisions are 'designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state.'"  Hollinger v. Home State Mut. Ins. Co., 654 F.3d 564, 570 (5th Cir. 2011) (quoting Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 682 (7th Cir. 2006).  The district court's order declining to further exercise jurisdiction[21] comported with that "delicate balance."

Gold concedes that CAFA's home state exception applies.  The exception's prerequisites are met – more than two-thirds of the putative class are citizens of New York, as are the primary (and all) defendants.  See 28 U.S.C. § 1332(d)(4).  Gold cannot show clear error in those undisputed factual findings.[22]  Likewise, Gold cannot show that the district court abused any discretion by following the mandate of 28 U.S.C. § 1332(d)(4) in the face of the undisputed facts presented herein.  Id.

---

[21]  It is undisputed that the district court has subject matter jurisdiction.  The home state exception does not destroy that jurisdiction.  Rather, it bars the court from exercising its jurisdiction when its elements are met.  See, e.g., Morrison v. YTB Int'l, Inc., 649 F.3d 533 (7th Cir. 2011) (exception "does not itself diminish federal jurisdiction.  It directs district judges to 'decline to exercise' jurisdiction otherwise present and thus is akin to abstention."); Graphic Commc'ns Union v. CVS Caremark Corp., 636 F.3d 971, 973 (8th Cir. 2011) (same); Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1023 (9th Cir. 2007) (same).

[22]  Gold incorrectly suggests that the dismissal order is subject to de novo review applicable to Rule 12(b)(1) rulings.  Gold Br., p. 68.  The district court, however, did not issue its ruling pursuant to Rule 12(b)(1).

## A.    The Home State Exception Is Not Discretionary Or Waivable.

By requiring that district courts "**shall** decline to exercise jurisdiction" where the elements of the home state exception are met, Congress directed the district court to refrain from adjudicating Gold's claims.  "Shall decline" is a mandatory directive.  Hollinger, 654 F.3d at 570-71 (noting that district court had discretion regarding "what evidence to use in making its determination of jurisdiction," but treating declination of jurisdiction as mandatory upon factual finding that elements of home state exception are met).  As Congress noted in enacting CAFA, "if two-thirds or more of the class members are from the defendant's home state, the case *would not be subject to federal jurisdiction.*"  Sen. Rpt. No. 109-14, at 28.

## B.    The Timing Of New York Life's Home State Exception Motion Was Immaterial But Nonetheless Appropriate.

The timing of New York Life's dismissal motion would matter only if 28 U.S.C. § 1332 afforded the parties the right to control when a federal court is authorized to exercise jurisdiction by choosing whether to invoke the home state exception.  The exception, however, is not a litigant's right.  Even if it was, however, Gold can point to no statutory provision establishing a deadline for choosing between federal or state jurisdiction.  The only authority Gold cites to argue that New York Life untimely invoked the home state exception are cases focused on whether a district court may entertain a home state exception *remand* motion filed after the statutory remand deadline of 28 U.S.C. § 1447(c).  As Gold

51

initiated this action in federal court (it was not removed), remand is not at issue. New York Life moved pursuant to 28 U.S.C. § 1332(d)(4), which contains no deadline. See Hart v. FedEx Ground Packaging Sys. Inc., 457 F.3d 675 (7th Cir. 2006) (noting Section 1332(d) "imposes no time limit" for motions and that, even in a removal case, such a motion would be proper once the case had been developed).

Even under Section 1447(c), no statutory deadline applies to a remand motion that is not predicated on a "defect" in removal procedure. See Kamm v. Itex Corp., 568 F.3d 752, 757 (9th Cir. 2009) (remand motion based on a forum selection clause was *not* untimely because Section 1447(c) only imposes a time limit for remand motions based on procedural defects); Graphic Commc'ns, 636 F.3d 971 (CAFA's local controversy exception is not a "defect" under § 1447(c)).[23]

Gold's argument for application of the Eighth Circuit's "reasonable time" standard for CAFA remand motions is wrong. That standard has been applied only in the removal/remand context. See Graphic Commc'ns, 636 F.3d 971 (8th Cir. 2011) (evaluating timeliness of a remand motion under Section 1447(c)). What's

---

[23] Gold cites Kamm to argue that the court should impose a time limit because Kamm suggested that remand was not mandatory even where no 30-day deadline applied. That reliance is misplaced. Kamm merely stated that there are "good policy reasons to impose a statutory time limit on a motion to remand based on a forum selection clause" because the "parties are, or should be, aware of a forum selection clause at the outset of the litigation." 568 F.3d at 757. Here, by contrast, when New York Life initially raised the home state exception, Gold argued that the issue would not ripen until the class composition was ascertained. A1804(¶4).

more, <u>Graphic Communications</u> itself was ultimately remanded to state court based upon CAFA's local controversy exception even though the remand motion was untimely under Section 1447(c).  <u>Id.</u>, <u>on remand</u>, No. 09-2203, 2011 WL 5826687 (D. Minn. Oct. 13, 2011) (remanding to state court under local controversy exception).  <u>Graphic Communications</u> does not support a conclusion that the district court erred or abused its discretion by not finding a waiver by New York Life.

Even if a "reasonableness time" standard applied, Gold has not shown that the district court abused its discretion in refusing to find a waiver.  In this regard, the facts show that New York Life was not dilatory in raising the home state exception.  Gold admits that New York Life raised the exception as early as January 2010, at which time Gold took the position that New York Life would need to "show evidence of [ ] class composition" to move for dismissal (Gold Br., p. 25) – evidence obtained after class discovery commenced in June 2011.[24]  That argument aligned with cases addressing the evidential requirements for a home state exception motion.  <u>See, e.g.</u>, <u>Conard v. Rothman Furniture Stores</u>, No. 09-2059, 2010 WL 2835565 (E.D. Mo. July 16, 2010) (denying initial remand motion because there had not been sufficient discovery regarding class member citizenship, but later remanding after discovery revealed citizenship); <u>Anthony v. Small Tube</u>

---

[24]  Even then, Gold challenged the sufficiency of the class data, such that New York Life had to retain a third-party vendor to verify class member addresses. A1607-08(¶9-11).

Mfg. Corp., 535 F. Supp. 2d 506 (E.D. Pa. 2007) (denying home state exception

motion due to insufficient class member citizenship evidence); Preston v. Tenet

Healthsystem Mem'l Med. Center, Inc., 485 F.3d 793, 800 (5th Cir. 2007) (proof of

class member citizenship – class definition and plaintiffs' medical records – was

insufficient for home state exception motion).  Accordingly, New York Life did not

invoke the exception until discovery required it to ascertain the class composition.[25]

Although Gold discounts this procedural history and cites cases addressing

parties' waiver of the right to remove or remand, he provides no authority

suggesting that compliance with the district court's scheduling orders, including

deferring class discovery (and, hence, determination of class composition) and

filing unrelated motions, amounts to a home state exception waiver.  His revisionist

argument that New York Life should have, or was obligated to, compile the class

list prior to class discovery rather than follow the "schedule set by the Court and

agreed to by the parties" (SPA33) is unfounded.  Thus, Gold cannot show that the

district court erred in any way, let alone abused its discretion by declining further

jurisdiction pursuant to the home state exception.

---

[25]  As New York Life previously had moved to strike the class allegations in
Chenensky (which mirror Gold's), it had no reason in the interim to undertake the
burden of preparing a class list.  After that motion was denied on April 27, 2011,
summary judgment was denied on Gold's Section 193 claim on May 19, 2011.
Class discovery commenced in June 2011, at which time New York Life was
required to generate for the first time a class list.

**V.    Dismissal Was Neither Unfair Nor Prejudicial.**

At page 75 of his Brief, Gold wrongly argues that the district court failed to consider what Gold claims are equitable factors weighing against abstention.  Gold, however, never raised these arguments before the district court and, therefore, is barred from raising them here.  Bogle-Assegai v. Connecticut, 470 F.3d 498, 504 (2d Cir. 2006) (appellate court will not consider issue raised for the first time on appeal).  Even had Gold not waived this argument, however, the mandatory nature of the home state exception would have precluded the Court from wading into Gold's "fairness" argument.

Further, Gold suffered no harm by the district court's adherence to the requirement that it "shall decline" to exercise jurisdiction in these circumstances.  The parties will not need to rehash any previously completed discovery in state court, nor would they have to relitigate the previously decided motions as the state court is bound by the district court's decisions.  See, e.g., Gentile v. MCA Records, Inc., 793 N.Y.S.2d 407 (1st Dep't 2005) (giving preclusive effect to federal rulings in successive state court action); Browning Ave. Realty Corp. v. Rubin, 615 N.Y.S.2d 360 (1st Dep't 1994) (same).

Furthermore, the Court should not hear Gold to complain about duplication of effort between the ongoing Chenensky litigation and this case in state court.  Indeed, it was Gold who opted to file his overlapping claims separate from the

55

related <u>Chenensky</u> case in the wrong court, even though Gold and those he purports

to represent are part of the putative <u>Chenensky</u> class, which continues to be

litigated.  Given the class overlap, none of the putative class members were harmed

by dismissal, even if Gold were not to pursue his claims in state court (which he

now is attempting to do).  Given this procedural posture, dismissal was neither

unfair, nor prejudicial to Gold or the putative class that he seeks to represent.

For these reasons, the district court's declination of jurisdiction was neither

error nor an abuse of discretion, and this Court should affirm.

## **<u>CONCLUSION</u>**

The pertinent facts and law underlying this appeal are undisputed: (i) Gold's

primary duty was to sell insurance, rendering him an exempt outside salesperson;

(ii) Gold's compensation arrangement lawfully mirrors the arrangement endorsed in

<u>Pachter</u>; (iii) nothing in the WTPA suggests that the legislature intended it to apply

retroactively; and (iv) the home state exception applies and required the district

court to decline the further exercise of jurisdiction.  Accordingly, New York Life

respectfully submits that the Court should enter an Order affirming in all respects,

but directing the district court to amend its Order denying summary judgment, by

entering judgment in favor of New York Life against Gold's Section 193 claim.

December 28, 2012                    Respectfully submitted,

                                    MORGAN, LEWIS & BOCKIUS LLP


                                    /s/ Sean P. Lynch
                                    Richard G. Rosenblatt
                                    Sean P. Lynch
                                    MORGAN, LEWIS & BOCKIUS LLP
                                    502 Carnegie Center
                                    Princeton, NJ  08540
                                    Telephone: 609.919.6609
                                    Facsimile: 609.919.6701

                                    Michael L. Banks
                                    MORGAN, LEWIS & BOCKIUS LLP
                                    1701 Market Street
                                    Philadelphia, PA  19103
                                    Telephone: 215. 963.5387
                                    Facsimile: 215.963.5001

                                    *Counsel for Defendants-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Brief of Defendants-Appellees has been filed by electronic case filing and served on counsel of record through the Court's Notice of Docket Activity on this 28th day of December, 2012.


/s/ Sean P. Lynch
Sean P. Lynch

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,987 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

/s/ Sean P. Lynch
Sean P. Lynch